THE STATE AND CITY OF CHARLOTTE v. E. P. STOWE.

(Filed 24 June, 1925.)                    •

1. **Health—Municipal Corporations — Cities and Towns — Cows — Statutes—Police Powers—Constitutional Law—Discrimination.**

   A municipal corporation is given authority to regulate the keeping of cows within its limits as pertaining to the health of its citizens and within its police powers, and in the reasonable exercise of such powers may prescribe and define a certain area therein wherein cows may not be kept, without violating the organic law against discrimination. C. S., 2787.

2. **Same—Courts.**

   An ordinance to preserve the health of its citizens is largely left to the determination of the municipal authorities, and will not be interfered with by the courts unless it is made manifestly to appear that it is unreasonable and oppressive.

CLARKSON, J., dissenting.

APPEAL by defendant from *Lane, J.,* at February Term, 1925, of MECKLENBURG.

Criminal prosecution tried upon a warrant charging the defendant with keeping cows in certain territory prohibited by ordinance of the city of Charlotte.

From an adverse verdict and judgment that the defendant pay a fine of $25 and the costs, he appeals.

*Attorney-General Brummitt and Assistant Attorney-General Nash for State.*
*McCall, Smith & McCall for defendant.*

STACY, C. J. This prosecution was commenced in the recorder's court of the city of Charlotte and tried *de novo* on appeal to the Superior Court of Mecklenburg County. From the latter court the case is brought here to test the validity of a "cow ordinance" of the city of Charlotte, the pertinent provisions of which are as follows:

"Section 1. It shall be unlawful to keep or maintain any cow or cows on any lot within any pen or stable within the corporate limits of the city of Charlotte within a radius of 50 feet of any dwelling," etc. (The remainder of this section deals with the kind of pen or stable to be provided; its validity is conceded and is not in dispute.)

"Section 2. That it shall be unlawful to keep any cow or cows on any lot or premises within the following limits of the city of Charlotte, to wit: Beginning at a point where the Seaboard Air Line Railroad crosses the Southern Railway near West Eleventh Street and runs along

the line of the Southern Railway to the Dowd Road; thence eastwardly from the Dowd Road to Mint Street and thence with a straight line from Mint Street to where the Columbia branch of the Southern Railroad crosses West Park Avenue; thence south with Columbia branch of the Southern Railroad to Tremont Avenue; thence along Tremont Avenue in an eastward direction to Avondale Avenue, continuing a straight line to West Dilworth Road; thence north along Dilworth Road to Rosa Avenue; thence with Rosa Avenue to east Morehead Avenue, near the residence of Lee Folger; thence with a straight line north to the bridge over Sugar Creek on East Fourth Street to Hawthorne Lane; thence north along Hawthorne Lane, continuing a straight line to the Seaboard Air Line Railroad; thence west along the Seaboard Air Line Railroad to the beginning."

The defendant lives in that territory covered by section 2 of the ordinance prohibiting the keeping of any cow or cows within the restricted area, and he contends that this portion of the ordinance is void, first, because it is unreasonable, and, second, because it creates an unlawful discrimination between the citizens living within the boundaries specified in said section and those who live in other parts of the city, but outside of the limits mentioned therein.

It is conceded that the right to pass regulatory ordinances with respect to keeping horses, cattle, sheep, swine, goats, dogs, and other animals in the city of Charlotte is specifically granted both by charter provision (Priv. Laws 1915, ch. 276, sec. 14) and by the general law. The pertinent provisions of C. S., 2787, dealing with the general powers of municipal corporations are as follows:

"6. To supervise, regulate, or suppress, in the interest of public morals, public recreations, amusements and entertainments, and to define, prohibit, abate, or suppress all things detrimental to the health, morals, comfort, safety, convenience, and welfare of the people, and all nuisances and causes thereof.

"7. To pass such ordinances as are expedient for maintaining and promoting the peace, good government, and welfare of the city and the morals and happiness of its citizens, and for the performance of all municipal functions.

"10. To make and enforce local police, sanitary, and other regulations."

Under the above grant of powers, we think the ordinance in question is valid. *S. v. Rice,* 158 N. C., 635; *S. v. Weddington,* 188 N. C., 643; *Lawrence v. Nissen,* 173 N. C., 359; *Ex parte Broussard,* 74 Tex. Cr., 333, Ann. Cas., 1917 E, 919, and note.

In the exercise of an unquestioned police power much must necessarily be left to the discretion of the municipal authorities, and their

acts will not be judicially interfered with, unless they are manifestly unreasonable and oppressive. Dillon's Mun. Corp., sec. 379; *McLean v. Kansas,* 211 U. S., 539; *Dobbins v. Los Angeles,* 195 U. S., 223; *S. v. Kirkpatrick,* 179 N. C., 747; *S. v. Shannonhouse,* 166 N. C., 241; *S. v. Lawing,* 164 N. C., 492; *S. v. Johnson,* 114 N. C., 846.

The fact that the ordinance in question prohibits the keeping of cows within certain defined limits of the city and permits them to be kept under specified restrictions in the remainder of the corporate territory is not *per se* an unreasonable regulation. It is presumed to be otherwise. *Ex parte Glass,* 49 Tex. Cr., 87; *Soon Hing v. Crowley,* 113 U. S., 703; *Barbier v. Connolly,* 113 U. S., 27; *In re Linehan,* 13 Pac. (Cal.), 170; *S. v. Rice, supra,* reported in 39 L. R. A. (N. S.), 266, and note; *Darlington v. Ward,* 48 S. C., 570, reported in 38 L. R. A., 326, and note; 1 R. C. L., 1161.

There is nothing appearing on the present record which would warrant us in declaring the ordinance void for unreasonableness or unlawful discrimination. *Lawrence v. Nissen, supra; S. v. Hord,* 122 N. C., 1092. The verdict and judgment must be upheld.

No error.

CLARKSON, J., dissenting: It is with regret that I cannot agree with the majority opinion. I do not think, as a matter of law, that the governing body of the city of Charlotte, consisting of three, a majority of two, however patriotic and efficient they may be, under the decisions of this Court or any other court in the United States until the present decision, can draw any kind of zig-zag or crooked line, in their discretion, in the city, and prohibit the keeping of a cow in the area and put one of its citizens to work on the roads of the county for keeping a cow. There is no dispute that a valid ordinance can be made to regulate the keeping of a cow. This is done in section 1 of the ordinance, and is applicable to all the citizens of the city alike. The Legislature has given this specific power to regulate. C. S., 2787, sec. 14; Private Laws 1915, ch. 276, sec. 57, subsec. 14, consolidated charter of the city of Charlotte, same power to regulate as C. S., 2787. In fact, the charter provides as follows, subsec. 10, *supra:* "To provide for inspection of all dairies inside and outside of the city limits doing business within the city and to regulate and maintain a standard for milk sold in the city; to provide for and regulate the inspection of all foodstuffs offered for sale in the city of Charlotte and to impose license fees on all persons engaged in any of said business." The charter even permitting the regulation of dairies in the city, how can it be construed to prohibit keeping a cow? The creature, the city, surely cannot have more power than the creator, the Legislature, that gave the power. The city has no power except that given by the legislative act.

But section 2 of the city ordinance prohibits absolutely the keeping a cow in the zig-zag district. There is no authority in the Constitution or law of this land, in my opinion, for such unreasonable, arbitrary, discriminatory, and autocratic power, and the ordinance, section 2, is unconstitutional and void. In this age, drifting toward "nervous particularity," we are forgetting the fundamental rights of a citizen. The evidence in the record is that one man drew the ordinance. All the evidence is that defendant kept his place clean. His neighbors testified that he kept the stables clean and there was no complaint, nothing offensive. The health officer had no complaint, nothing offensive. The defendant kept the two cows 14 years, and there was no complaint. He has a big lot. The sooner we call a halt, the better, and go back to everyday common-sense. From a thorough search, I can find no precedent in this nation that says so useful an animal as a cow can be absolutely prohibited. They can be regulated. In France, Germany, and many other countries a cow is so useful to a family that they are often kept under the same roof and carefully fed and cared for—the milk being so nourishing and useful as food, especially for children.

1 R. C. L., p. 1160, part sec. 104, dealing with this subject, says: "Under the general grant of legislative power to declare what shall constitute a nuisance, and to prevent, abate, and remove the same, some municipalities have enacted ordinances expressly prohibiting the keeping anywhere within the corporate limits or, where the power has been conferred, within a stated distance beyond, of such animals as, from their known habits or mode of life, are deemed particularly offensive or detrimental to public health. Notorious among these which may thus be said to have been branded by municipal or legislative declaration as nuisances *per se* may be mentioned the hog and the jackass. Such enactments providing for the complete and absolute banishment of the prescribed animals from the corporate limits appears to have been sustained as a legitimate and proper exercise of the police power."

In *Mugler v. Kansas,* 123 U. S., p. 623, *Mr. Justice Harlan,* writing the opinion, says, at p. 661: "Under our system, that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine primarily what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety. . . . The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted

to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge and thereby give effect to the Constitution. Keeping in view these principles, as governing the relations of the judicial and legislative departments of government with each other, it is difficult to perceive any ground for the judiciary to declare that the prohibition by Kansas of the manufacture or sale within her limits of intoxicating liquors for general use there as a beverage is not fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of ardent spirits. There is no justification for holding that the State, under the guise merely of police regulations, is here aiming to deprive the citizen of his constitutional rights, for we cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks, nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil."

In *R. R. v. City of Goldsboro,* 232 U. S., p. 558, *Mr. Justice Pitney,* affirming the decision of this Court (155 N. C., p. 356), says, at p. 558: "For it is settled that neither the 'contract' clause nor the 'due process' clause has the effect of overruling the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. *Slaughter-house cases,* 16 Wall., 36, 62; *Munn v. Illinois,* 94 U. S., 113, 125; *Beer Co. v. Massachusetts,* 97 U. S., 25, 33; *Mugler v. Kansas,* 123 U. S., 623, 665; *Crowley v. Christenson,* 137 U. S., 86, 89; *New York, etc., R. R. Co. v. Bristol,* 151 U. S., 556, 567; *Texas, etc., R. R. Co. v. Miller,* 221 U. S., 408, 414, 415."

In the *Mugler case, supra,* the sale of liquor was an evil in itself— *per se.* What evil *per se* is there in a cow? The cow can be kept, under regulations, as clean as any animal.

The decision in the *Goldsboro case, supra,* was a regulation as to limiting speed of trains, etc., in Goldsboro.

The only suggestion in the present case that a cow should be prohibited is in the brief of the Attorney-General: "To keep a cow in a thickly settled residential district is to invite the presence of numerous flies, which are regarded now as carriers of disease."

Writing for the Court, in *Storm v. Wrightsville Beach,* 189 N. C., p. 682, it was said: "An incinerator for the destruction of garbage in a town, of all things, especially a town on a beach that functions mostly in the summer, is a necessary expense. It eliminates the odor that comes from filth and is a great health precaution. It destroys the breeding-place of flies—annoying, to say the least, to man and beast. It is a medical fact that flies breed so rapidly that in a short period their increase is enormous. Of course, they die, but they must have filth to breed on and food to live on. The breeding places must be eliminated; if not, from these places of filth they 'come into the habitation of man (hence the growth in screening) and pollute and poison food and drink. To this army of little marauders the medical fraternity claim that, in consequence of this filth and disease-carrying fly, not only the strong, but the weak, and especially children, are liable to, in common parlance, 'catch' such diseases as typhoid fever, dysentery, diarrhœa of infants, etc. The old saying is, 'Cleanliness is, indeed, next to Godliness.' Many cities and towns in the State have erected incinerators and taken it for granted that this court would hold they were a necessary expense. The idea is as old as the Mosaic law."

The municipality can regulate keeping the cow, as in section 1 of the ordinance—screen the pen or stable and make the place free from flies as the ordinary kitchen of the average citizen; regulate so as to destroy the breeding place of flies. Don't destroy or prohibit the most useful animal in the world.

From Agricultural Extension Service Circular No. 107, distributed in furtherance of the acts of Congress and North Carolina Agricultural Extension Service, August, 1920, I quote the great value of milk: "Milk and its products represent at the present time about 20 per cent of our entire diet. These foods supply fat that promotes growth, proteins of exceptional quality, carbohydrates equal and possibly superior to those of other foods, ideal mineral matter, and the vitamines that are so essential to growth, health, and vigor. Milk is a perfect and complete food. *It is nature's greatest food product and our best qualified authors tell us that it should form over 40 per cent of our diet.* (Italics mine.) In North Carolina this is impossible, with the present number of dairy cows and the methods under which they are handled."

Dr. W. S. Rankin, State Health Officer, says: "Failure to use milk in sufficient quantity and of pure quality with infancy and early childhood is, in all probability, the greatest sin that parents commit against their children. Upon an adequate milk supply the future of the child and the race is dependent more perhaps than on any other single factor." Dr. McCollum, of Johns Hopkins University, says: "The people who have achieved, who have become large, strong, vigorous people, who

have reduced their infant mortality, who have the best trades in the world, who have an appreciation of art, literature and music, and who are progressive in science, and in every activity of the human intellect, are the people who have used milk and its products liberally." Cow Facts, Folder No. 5, North Carolina Agricultural Extension Service.

Physicians, as well as common-sense, tell us that if the body is kept fit by nutritious food, milk, nature's greatest food product, that the fly or any other germ carrier is not so apt to inoculate with poison. A healthy body absorbs or throws off the poison. It is the weak and undernourished that are more liable to be infected. A cow to a family is one of the cheapest and greatest blessings.

The North Carolina Department of Agriculture says: "According to Mr. Arey, our dairy specialist, the average milch cow in North Carolina gives ten pounds of milk per day on a basis of three hundred milking days per year, or 3,000 pounds per year. . . . The average value of a cow in North Carolina is $50, and the average value of her products per year is $87."

It is a matter of common knowledge that great effort is now being made in breeding fine milch cows—Guernsey, Holstein, and especially Jersey cattle—in this commonwealth for the nourishing food—milk.

In the majority opinion, no specific authority by the Legislature is cited, if one could be given under the police power, to the city of Charlotte to prohibit the keeping of a cow. The right is given to regulate. The only authority is one guessed at as included in C. S., 2787:

"(6) To supervise, regulate, or suppress, in the interest of public morals, public recreations, amusements and entertainments, and to define, prohibit, abate, or suppress all things detrimental to the health, morals, comfort, safety, convenience, and welfare of the people, and all nuisances and causes thereof.

"(7) To pass such ordinances as are expedient for maintaining and promoting the peace, good government, and welfare of the city, and the morals and happiness of its citizens, and for the performance of all municipal functions.

"(10) To make and enforce local police, sanitary, and other regulations."

The charter of the city, especially by implication, gives the right to even keep dairies under regulations, *supra.*

The majority opinion says, "Under the above grant of powers, we think the ordinance in question is valid," and cites three North Carolina opinions:

(1) *S. v. Rice,* 158 N. C., p. 635, holding the ordinance valid, keeping any hogs or pigs within the corporate limits. Two of the judges dissented.

(2) *Lawrence v. Nissen,* 173 N. C., p. 359, An ordinance prohibiting a hospital to be built within 100 feet of a residence was held valid. Two of the judges dissented.

(3) In *S. v. Weddington,* 188 N. C., 643, was a Sunday ordinance held valid, as follows: "That it shall be unlawful for any person or persons, merchants, tradesmen, or company to sell or offer for sale on Sunday any goods, wares, drinks or merchandise of any kind or character, except in case of sickness or absolute necessity, in the town of Faith."

This is a different class of ordinance than the one under consideration. The Sunday ordinance is predicated on the idea that there should be a rest day for man. The forbidding keeping open stores gives the rest and applies to all in the town alike.

The majority opinion also cites in *Ex parte Broussard,* 74 Tex. Cr., 333, Anno. Cas., 1917E, 919, and note. The *Texas case* was an ordinance allowing the keeping of not more than six head of cattle (cows in the case) within 300 feet of a private residence; "a permit must be obtained from the City Council." This was a regulation, not a prohibition. It is cited in Anno. Cas., *supra.* In the authority cited, the "and note" referred to "validity of ordinance regulating keeping of cattle within municipal limits." In Anno. Cas., 1917E, p. 929, the principle is laid down as follows:

"General Rule. It is generally held that an ordinance regulating the keeping of cattle within municipal limits is a valid exercise of the police power delegated to a municipality when the ordinance in question is not unreasonable or arbitrary," citing a wealth of authorities. The Anno. Cas. is cited in the majority opinion, and this is all I contend for. You can regulate, not prohibit. In no case in the "and note" is there any decision prohibiting the keeping of a cow.

The majority opinion does not cite *S. v. Bass,* 171 N. C., p. 784, exactly in point, which declares a livery stable not a nuisance *per se.* Only one dissent to this opinion. That case, written by *Brown, J.,* lays down this sound doctrine applicable here: "An ordinance to be valid must be uniform in its application to all citizens and afford equal protection to all alike. It must not discriminate in favor of one person or class of persons over others. To be valid it must furnish a uniform rule of action. *S. v. Tenant,* 110 N. C., 612. It must operate equally upon all persons, as well as for their equal benefit and protection, who come or live within the corporate limits. 1 Dillon Mun. Corp., sec. 380; *S. v. Pendergrass,* 106 N. C., 664; *S. v. Summerfield,* 107 N. C., 898."

If a livery stable is not a nuisance *per se* and cannot be prohibited, and they are in all the towns and cities of the State, as are horses, dogs, etc.—all will attract flies, the only ground on which the cow is to

be prohibited—why is not a livery stable, a dog, a horse, chickens, a nuisance? Why should they not all go? Of course, common-sense, as well as law, says you can regulate, but here is a prohibition. The tax on a little tea without representation, which brought on the "Declaration of Independence," is not so weighty a matter as to absolutely prohibit, not regulate, a cow in a municipality—which produces life-giving food, milk, for a family. The municipality destroys the use of the property under the guise of police power. Most of the decisions cited in the majority opinion deals with regulation, which is not disputed, but prohibition of a cow is what I cannot agree on. There can be found no opinion in any State in the United States or by the Supreme Court of the United States, except this present opinion, that prohibits, not regulates, the keeping of a cow in a municipality. Such an unreasonable and arbitrary ordinance under our system of government should not be permitted.

The able and learned counsel for the defendant well says: "We know that by a subtle process of reasoning the courts have generally found grounds to uphold ordinances passed by municipalities, although they impugned upon the rights and liberties of the people, but it's time a well-defined line of demarcation was being drawn beyond which law-making bodies cannot go in quest of liberties to be restrained and regulated. The old adage that 'every citizen of this republic is entitled to equal protection of the law and to enjoy the benefits of *equal laws,*' has been relegated to the ever-increasing scrap-pile of civil liberties abolished by arbitrary law-making bodies. The defendant had all his life been a respected and law-abiding citizen of the city of Charlotte, and had, up to 10 June, 1924, kept his two milch cows in accordance with laws which had been in existence 'from the time whereof the memory of man runneth not to the contrary.' "